UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT G. WRIGHT, JR.,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION,<br><br>    Defendant. | Civil Action No. 02-915 (GK) |
| JOHN VINCENT,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION,<br><br>    Defendant. | Civil Action No. 03-226 (GK) |

REDACTED MEMORANDUM OPINION

This is a sad and discouraging tale about the determined efforts of the FBI to censor various portions of a 500-page manuscript, written by a former long-time FBI agent, severely criticizing the FBI's conduct of the investigation of a money laundering scheme in which United States-based members of the Hamas terrorist organization were using non-profit organizations in this country to recruit and train terrorists and fund terrorist activities both here and abroad.  The FBI also sought to censor

answers given by both Plaintiffs to a series of written questions presented to them by a New York Times reporter concerning Wright's allegations about the FBI's alleged mishandling of the investigation.  In its efforts to suppress this information, the FBI repeatedly changed its position, presented formalistic objections to release of various portions of the documents in question, admitted finally that much of the material it sought to suppress was in fact in the public domain and had been all along, and now concedes that several of the reasons it originally offered for censorship no longer have any validity.

Unfortunately, the issues of terrorism and of alleged FBI incompetence remain as timely as ever.

\* \* \*

Plaintiffs are Robert G. Wright, Jr., a FBI Special Agent based in Chicago, and John Vincent, a retired FBI Special Agent, who were both members of the FBI's Counter-Terrorism Task Force. Plaintiffs were denied permission, pursuant to the FBI's prepublication review policy, to publish certain writings critical of the FBI's counter-terrorism efforts.  They bring these separate lawsuits against the Defendant, Federal Bureau of Investigation ("FBI" or "Government").  Vincent has also named the Department of Justice ("DoJ") as a Defendant.[1]   In their Second Amended

---

[1]     The Court uses the term "Defendants" throughout this Opinion to refer to the FBI and the DoJ.  Where only Plaintiff
(continued...)

Complaint, both Plaintiffs alleged the same causes of action: that Defendants violated the First Amendment (Count I), 28 C.F.R. § 17.18 (the FBI's prepublication review regulation) (Count II), and the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (B), and (D) (Count III). After this Court's Opinions on July 31, 2006 and February 24, 2009, two Counts remain: (1) Count I and (2) the portion of Count III based on Section 706(2)(B) of the APA.

Plaintiffs seek: (1) a declaratory judgment that Defendants' refusal to grant them permission to publish their writings was unlawful; (2) an injunction prohibiting Defendants from continuing to refuse them permission to publish their writings; and (3) attorneys' fees and costs.

This matter is now before the Court on Defendants' Renewed Motions for Summary Judgment [Dkt. No. 76²] and Plaintiffs' Renewed Motions for Summary Judgment [Dkt. No. 90].³ Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, including the sealed in camera submissions, and for the reasons stated below, Defendants' Renewed Motions for Summary Judgment

---

¹(...continued)
Wright's submissions are concerned, however, the term refers to only the FBI.

²      For the sake of simplicity, Docket Numbers refer only to Wright, 02-915.

³      Although these cases have not been consolidated, the Court has addressed the Renewed Motions for Summary Judgment in both cases in this single Memorandum Opinion because almost all the legal issues and many of the facts overlap.

[Dkt. No. 76] are **granted in part and denied in part** with respect to the Fatal Betrayals manuscript, **denied** with respect to the Miller interview questions, and **denied** with respect to the OIG complaints. Plaintiffs' Motions for Summary Judgment [Dkt. No. 90] are **granted in part and denied in part** with respect to the Fatal Betrayals manuscript, **granted** with respect to the Miller interview questions, and **granted** with respect to the OIG complaints. An Order shall accompany this Memorandum Opinion.

## I.    BACKGROUND[4]

### A.    Factual Background[5]

Upon joining the FBI, Plaintiffs signed an agreement requiring them to seek prepublication review from the Office of Public and Congressional Affairs ("OPCA") of a broad category of information before disclosing it publicly.  The agreement states,

> as consideration for employment, I agree that
> I will never divulge, publish, or reveal . . .
> to any unauthorized recipient without official
> written authorization by the Director of the
> FBI or his delegate, any information from the
> investigatory files of the FBI or any
> information relating to material contained in
> the files, or disclose any information or
> produce any material acquired as a part of the
> performance of my official duties or because
> of my official status . . . I agree to request
> approval of the Director of the FBI in each

---

[4]    Unless otherwise noted, this section contains only uncontroverted facts.

[5]    This section is a condensed version of the Background section in the July 31, 2006 Opinion.

-4-

> such instance by presenting the full text of
> my proposed disclosure in writing . . . at
> least thirty (30) days prior to disclosure. I
> understand that this agreement is not intended
> to apply to information which has been placed
> in the public domain . . . .

Defs.' Vincent Mot., Ex. 19.

In addition, the FBI had adopted a prepublication review policy, which is mandatory for all current and former FBI employees. Its purpose is to "identify information obtained during the course of an individual employee's employment/work with the FBI, the disclosure of which could harm national security, violate federal law, or interfere with the law enforcement functions of the FBI." Id., Ex. 1.

Pursuant to the prepublication review policy, Wright sought permission to publish: (1) his five-hundred page manuscript ("Fatal Betrayals manuscript") about an investigation ("Vulgar Betrayal investigation") into known terrorist threats against United States national security and the FBI's efforts to thwart that investigation; (2) his answers from an interview with New York Times reporter Judith Miller; (3) a thirty-eight page complaint filed with the DoJ Office of Inspector General ("OIG"), titled "Dereliction of Duty by the Federal Bureau of Investigation in Failing to Investigate and Prosecute Terrorism and Obstruction of Justice in Retaliating Against Special Agent Robert G. Wright,

Jr."; and (4) a 113 page complaint[6] titled "Whistleblowing Retaliation by the Federal Bureau of Investigation against Special Agent Robert G. Wright, Jr." (referred to together herein as "OIG complaints"). Wright sought permission to publish his Fatal Betrayals manuscript and his OIG Complaints. Vincent sought permission to publish only his answers from his interview with Judith Miller.

Both Plaintiffs worked on the Vulgar Betrayal investigation, which uncovered a money laundering scheme in which United States-based members of the HAMAS terrorist organization were using nonprofit organizations to recruit and train terrorists and fund terrorist activities in the United States and abroad. The Vulgar Betrayal investigation ultimately resulted in the FBI's seizure of $1.4 million in funds which were targeted for terrorist activities.[7] The seized funds were linked directly to Saudi businessman Yassin Kadi, who was later designated by the Government as a financial supporter of Osama Bin Laden. Plaintiffs' submissions were highly critical of the FBI's handling of the

---

[6]   According to the Second Amended Complaint, this document was to be filed with the DoJ OIG "at a later date." Second Am. Compl. ¶ 19.

[7]   Defendants agree that the Vulgar Betrayal investigation was shut down in 1999 and officially closed in August 2000.

Vulgar Betrayal investigation and other FBI operations which took place prior to September 11, 2001.[8]

Wright submitted his Fatal Betrayals manuscript for prepublication review in the beginning of October 2001.[9]  In the beginning of January 2002, the FBI informed him that about 18 percent of the manuscript would require modifications because it contained "classified information; information containing sensitive investigative material and information protected by the Privacy Act."  In accordance with the FBI's suggestions, Wright edited and resubmitted his materials, with the 18 percent either deleted or modified to address the Government's concerns.  In support of his revisions, Wright submitted three binders full of endnotes, which he alleges provided a public source of information for each of the passages to which Defendants had objected.

On November 13, 2001, Wright submitted his OIG complaints to OPCA for prepublication review.  On January 7, 2002, OPCA responded, taking issue with only 4 percent of the first document and 6 percent of the second.  On January 18, 2002, Wright re-submitted the documents with deletions and edits responsive to OPCA's concerns.

---

[8]     Wright completed his manuscript days after the attacks on September 11, 2001.

[9]     Wright resubmitted his manuscript in November 2001, after being informed that delivery of the first copy was delayed by disruptions in mail flow due to anthrax incidents.

In March 2002, New York Times reporter Judith Miller submitted a series of written questions to Wright concerning his allegations about the FBI's mishandling of the Vulgar Betrayal investigation. She gave Vincent a similar series of questions. In March of 2002, Miller also interviewed FBI officials, including Wright's supervisor, about Wright's charges against the agency. On March 31, 2002, both Wright and Vincent submitted to OPCA their proposed answers to Miller's questions for prepublication review.

On May 10, 2002, the day after Wright filed suit in this Court, the FBI responded separately to Wright and Vincent regarding all of their submissions. The FBI indicated to both of them that as a result of its review and guidance from the U.S. Attorney's Office for the Northern District of Illinois,[10] all of Plaintiffs' submissions contained information regarding open investigations, matters occurring before a grand jury, and information relating to law enforcement techniques and other sensitive information. According to the FBI, the protected information was so intertwined with other unprotected material in the submissions, that they could

---

[10] At some point, the FBI consulted with the U.S. Attorney's Office for the Northern District of Illinois because that office had "participated in the investigation(s), possessed a detailed knowledge of the investigation(s), and had an interest in the success of the investigation(s)." Pl. Vincent's Original Mot. at 11. The FBI also consulted with the U.S. Attorney's Office for the Eastern District of Wisconsin. Both offices informed the FBI that Plaintiffs' submissions were not suitable for publication. Id. at 11, 20.

not be amended or segregated so as to be suitable for publication.[11]
The FBI therefore reversed its prior position and denied Wright
permission to publish any of the materials he had submitted, and
issued a blanket denial as to Vincent's interview answers.

In early June 2002, both Wright and Vincent appealed these
decisions to the FBI Director, Robert Mueller, and their appeals
were denied.

On November 7, 2002, and January 6, 2003, respectively,
Plaintiffs Wright and Vincent appealed to the Office of the Deputy
Attorney General pursuant to 28 C.F.R. § 17.18(i).  On December 19,
2002, and January 17, 2003, respectively, Deputy Attorney General
David Margolis responded, indicating that an appeal to his office,
which handled appeals of FBI decisions prohibiting disclosure of
classified information, was inappropriate because "no classified
information" was contained in Plaintiffs' submissions.

Approximately fifteen months later, the FBI changed its
position yet again.  On October 31, 2003, more than two years after
Wright first submitted the Fatal Betrayals manuscript for
prepublication review, the FBI sent him a letter explaining that
"following a request from a Congressional committee for the

---

[11]    The FBI did not provide specific objections by line and
paragraph number, as required by the FBI's Manual of Administrative
Operations and Procedures ("MAOP").    MAOP Part I, Section
4(a)(3)(d) (The prepublication review panel must "either authorize
disclosure in full or provide written objections to specific
portions (by page and paragraph number) specifying why the FBI
should withhold permission to disclose").

[manuscript] another review had been conducted . . . and that it had been determined that Chapters 1-4 (inclusive)" and parts of Chapter 7 could be published.  The FBI still prohibited publication of Chapters 5-6 and 8 through 27.

On December 22, 2003, approximately one year and seven months after its blanket denial of Vincent's request, the FBI sent him a letter stating that the answers to many of the interview questions previously submitted (2-6, 8-9, 11-14, 16, 18-19, and 21) could be disclosed in their entirety, and that the answers to questions 15 and 17 could be disclosed in part.  On May 4, 2004, the FBI granted Vincent permission to publish the response to interview question 15 in full.   The FBI continued to prohibit publication of five of Vincent's interview answers: 1, 7, 10, part of 17, and 20.

On February 5, 2004, the FBI changed its position one more time and sent Wright a letter advising him that it had conducted a re-review of his answers to Judith Miller's interview questions and had determined that answers 2-6, 8, 11-13, 15-16, 18-19, 21, 25-26 and parts of 1, 9, and 14 could be published.

Finally, on March 25, 2004, the FBI sent Wright a letter stating that his OIG complaints could be submitted to the DoJ OIG without the need for prepublication review, but that release to any other party was prohibited.[12]

---

[12]    Wright's OIG complaints had already been submitted to the OIG in 2001. See Wright Decl. at ¶ 43.

**B.    Procedural Background**

Plaintiff Wright filed his Complaint in this Court on May 9, 2002, an Amended Complaint on December 6, 2002, and a Second Amended Complaint on August 18, 2003. Plaintiff Vincent filed his Complaint in this Court on February 12, 2003.

On July 31, 2006, the Court denied Plaintiffs' Motions for Summary Judgment, granted Defendants' Motions for Summary Judgment with respect to Plaintiffs' claims under 28 C.F.R. § 17.18 (Count II) and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), and (D) (Count III), and denied Defendants' Motions with respect to Plaintiffs' First Amendment claims (Count I) [Dkt. Nos. 69, 70] ("July 31, 2006 Opinion). In that ruling, the Court also denied Plaintiffs' Motions for Summary Judgment.

Plaintiffs filed a Motion for Reconsideration, asking the Court to reconsider its decision to grant Defendants' Motion for Summary Judgment with respect to all APA claims. Plaintiffs argued that since the Opinion intended to preserve all constitutional claims, Defendants' Motion should have been denied with respect to Section 706(2)(B) of the APA, thereby allowing Plaintiff to challenge agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). On February 24, 2009, the Court granted Plaintiffs' Motions for Reconsideration. As a result, Count III was reinstated for claims based on Section 706(2)(B) of the APA.

Defendants filed their Renewed Motion for Summary Judgment on September 9, 2006 [Dkt. No. 76]. In the alternative, the Motion requested a stay in the proceedings until the conclusion of the proceedings in United States v. Marzook, No. 03-CR-978 (N.D. Ill.), in the Northern District of Illinois. Defs.' Renewed Mot. at 1. Plaintiffs' response was originally due on October 30, 2006, but Plaintiffs filed and were granted eight Motions for Extension of Time. On February 14, 2007, Plaintiffs filed their Opposition and Cross Motion for Summary Judgment [Dkt. Nos. 88, 90]. On March 14, 2007, Defendants filed a Reply and an Opposition [Dkt. Nos. 94, 95], and on March 23, 2007, Plaintiffs filed a Reply [Dkt. No. 96].

On February 26, 2008, the Court stayed the case until April 1, 2008, pending the filing of the appellate briefs in the appeal of the Marzook case [Dkt. No. 101]. On April 4, 2008, after a delay in the filing of the briefs, the Court continued the stay until April 30, 2008. On May 21, 2008, after yet another delay in the filing of the briefs, the Court continued the stay until June 30, 2008, and set a Status Conference for July 8, 2008 [Dkt. No. 108].

Two Status Conferences were held in July 2008, one on July 8 and one by phone on July 28. At the July 8, 2008 Status Conference, Defendants argued that releasing the information in Plaintiff Wright's manuscript could affect the Marzook appeal. To support this argument, they offered to provide an affidavit from the Assistant U.S. Attorney for the Northern District of Illinois.

-12-

In response, Plaintiffs argued that further delay would be inappropriate and that the case should be adjudicated immediately.

Following this Status Conference, on July 8, 2008, the Court ordered Defendants to submit an affidavit from the Assistant U.S. Attorney assigned to the Marzook case by July 18, 2008 [Dkt. No. 110].

On July 18, 2008, Defendants filed two affidavits. In the first, David Hardy, an employee in the Records Management Division at the FBI, stated that "[i]n the event that the Marzook prosecutors lift some or all of their objections to the release of related information contained in plaintiff's manuscript, the FBI will release a new version to plaintiff which would allow release of that previously redacted information." On the other hand, redactions "that were not at the request of the Marzook prosecutors" would remain redacted.

The second affidavit was submitted in camera by Joseph M. Ferguson, the Assistant U.S. Attorney handling the Marzook appeal. He stated that publishing the manuscript would interfere with the Marzook appeal and a pending civil forfeiture matter.

Plaintiffs responded to the two filings on July 25, 2008. They argued that the narrow issue on appeal -- whether the judge in the Northern District of Illinois had "properly applied the Sentencing Guidelines" -- would not be affected by the publishing of Plaintiff Wright's manuscript.

-13-

In the telephonic Status Conference on July 28, 2008,
Defendants again asked for an extension of the stay, this time
until September 15, 2008.[13]  Although Defendants conceded that the
only issue on appeal was a sentencing issue, they argued that an
extension of the stay was warranted because the sentencing involved
a terrorism enhancement.

During this telephonic conference call, the Court expressed
its deep concern about the enormous delays and their impact on
Plaintiffs' First Amendment rights. On August 5, 2008, Defendants'
Motion to Stay was terminated.

On November 4, 2008, the Court ordered Defendants to submit a
second declaration from the U.S. Attorney's Office.   After
requesting and receiving one extension of time, Defendants filed a
second in camera declaration from Assistant U.S. Attorney Ferguson
on December 1, 2008.   More than two years after making their
original request for a stay, Defendants withdrew their assertions
that publishing the manuscript would interfere with the Marzook
appeal, and presented a new excuse for requesting an extension of
the stay -- namely that it was needed because of a pending civil
forfeiture action.

A Status Conference was held on January 6, 2009.  Plaintiffs
again argued that the Government had not provided reasonably

_____

        [13]    Defendants represented that the appellate brief in the
Marzook appeal was due on September 8, 2008.

-14-

specific justifications to support their argument that the publication of the manuscript should be delayed. Moreover, they argued that the government had not shown "urgency" in handling the matter. In response, the Government argued that the lengthy stay was not an intentional delay tactic but was instead due to scheduling difficulties in the Northern District of Illinois.

At the conclusion of the Status Conference, the Court ordered the parties to confer prior to February 2, 2009 and ordered the Government to make a "specific offer of the redactions that it believes are necessary prior to publication" of Plaintiff Wright's manuscript.

At a Status Conference on February 2, 2009, the Government stated that Assistant U.S. Attorney Ferguson had -- finally -- dropped his objections to the release of the manuscript and that it would therefore be able to make a final determination of its objections to the manuscript. It also argued that Plaintiffs had not carried their burden of showing that certain information was in the public domain. Plaintiffs argued that the Motions should be decided promptly and that the Government, and not Plaintiffs, bore the burden of proving that information was in the public domain.

At the conclusion of the Status Conference, the Court ordered each party to file a sealed submission no later than February 16, 2009 "identifying the information that they agree is in the public domain and identifying the specific information that remains in

-15-

dispute."   For information about which they disagreed, the Court ordered Plaintiffs to provide "specific citations to the public record."

After the Court granted one extension of time, the parties submitted a Joint Status Report on February 20, 2009.  The Status Report stated that the parties had resolved their dispute about the endnotes in Plaintiff Wright's manuscript and had agreed that every endnote correlated to material in the public domain.   It also stated that the Government had provided Plaintiff Wright with its remaining objections to the manuscript and noted that "[t]hese sections are substantially fewer in number."   Finally, the parties proposed that they submit a joint report "discussing the significance of this development" on March 6, 2009.

On February 23, 2009, the Court ordered the parties to file a Second Joint Status Report on March 6, 2009.  The Order stated that this Status Report "shall set forth with specificity and appropriate case citations the legal positions of the parties with regard to all factual information it contains."

After the Court granted two extensions of time requested by the Government -- the first unopposed and the second opposed -- Plaintiffs and Defendants filed separate status reports.[14]

---

[14]      Plaintiffs filed their status report on March 12, 2009. Defendants requested a one-day extension and filed theirs on March 13, 2009.  Defendants also filed a Declaration of David Hardy under seal on March 16, 2009 ("Hardy Decl.") [Dkt. No. 137].

## II.  Standard of Review

A motion for summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is, it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in Scott v. Harris, __ U.S. __, 127 S.Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986)

-17-

(footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Liberty Lobby, 477 U.S. at 247-48 (emphasis in original).

## III. ANALYSIS

### A.   Censorship Standard Under the First Amendment

The Supreme Court has long recognized that expression about public issues rests "on the highest rung of the hierarchy of First Amendment values." Carey v. Brown, 447 U.S. 455, 467 (1980). The constitutional protection for freedom of expression on public matters, which was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U.S. 476, 484 (1957), is at the very core of our constitutional and democratic system. Stromberg v. People of State of Cal., 283 U.S. 359, 369 (1931). Therefore, in addressing challenges under the First Amendment, such as Plaintiffs make in this case, courts must keep in mind that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (citing Terminello v. Chicago, 337 U.S. 1, 4 (1949); De Jonge v. Oregon, 299 U.S. 353, 365 (1937)).

The Supreme Court has also recognized, however, that the speech of public employees on matters of public concern may be curtailed in ways that, if imposed on the general public at large, would violate the Constitution. Pickering v. Bd. of Education, 391 U.S. 563, 568 (1968); United States v. NTEU, 513 U.S. 454, 465 (1995). As the Court specifically noted in Pickering:

> the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem . . . is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568.

In McGehee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983), our Court of Appeals fleshed out the contours of Pickering and articulated a standard for judicial review of individual censorship decisions made by the CIA pursuant to the type of secrecy agreement which is at issue in this case. The Court discerned two consistent themes from the post-Pickering Supreme Court cases, and found them most clearly articulated in Brown v. Glines, 444 U.S. 348 (1980). Those principles, upon which McGehee relied, at 718 F.2d 1142-43, are:

> First, restrictions on the speech of government employees must "protect a substantial government interest unrelated to the suppression of free speech" (quoting Brown, 444 U.S. at 354). . . [and] Second, the restriction must be narrowly drawn to

-19-

> "restrict speech no more than is necessary to
> protect the substantial government interest"
> (quoting Brown, 444 U.S. at 355).

In order to apply those principles, McGehee required agencies to explain their justifications for censorship with "reasonable specificity" and to demonstrate "a logical connection between the deleted information and the reasons for the [censorship]."[15]   718 F.2d at 1148.   The McGehee court concluded that the Government satisfied this "reasonable specificity" standard by providing "reasonably convincing and detailed evidence of a serious risk that intelligence sources and methods would be compromised by" the information the plaintiff sought to disclose.   718 F.2d at 1149.

McGehee also makes clear that the district court must determine which portions, if any, of the requested material are already in the public domain since the "government may not censor [information obtained from public sources]" and "has no legitimate interest in censoring unclassified materials."   Id.   Given that the parties in this case have now, finally, resolved their dispute about those sections of the manuscript which are already in the public domain, see infra, III.B, this issue need not be examined in detail.

---

[15]     The McGehee opinion often uses the words "classification" and "censorship" interchangeably.   See 718 F.2d at 1148, where the Court says the courts must satisfy themselves that the CIA in fact had good reason "to classify and therefore censor" the material in issue.

More recently, in <u>Weaver v. United States Information Agency</u>, 87 F.3d 1429 (D.C. Cir. 1996), the Court of Appeals had another opportunity to re-examine the thorny issue of censorship, by way of pre-publication review, of government employees' writings.

The <u>Weaver</u> court recognized that its <u>McGehee</u> opinion "contain[ed] strands of both <u>Pickering</u> balancing and . . . the two-part test set out in <u>Brown [v. Glines]</u>." 87 F.3d at 1440. However, in the final analysis, <u>Weaver</u> incorporated the <u>Brown v. Glines</u> two-part test into the <u>Pickering</u> balancing and embraced what it referred to as "the test of <u>Pickering</u> and <u>NTEU</u>," <u>id.</u>:

> Restraints on the speech of government employees on "matters of public concern" are governed by a balancing test; they are permissible where the government interest in "'promoting the efficiency of the public services it performs through its employees'" outweighs the interests of prospective speakers and their audiences in free dissemination of the speakers' views. <u>NTEU</u>, 513 U.S. __, 115 S.Ct. at 1012-14 (quoting <u>Pickering</u>, 391 U.S. at 568, 88 S.Ct. at 1735.

87 F.3d at 1439.

**B.    The Parties Agree that All Footnoted Material Is in the Public Domain and that Plaintiffs Will Not Release the Actual Names of Law Enforcement Officials Who Are Not Public Figures**

Since the filing of their Renewed Motions for Summary Judgment, the parties have reached agreement on two issues. First, they now agree that "no factual dispute remains as to whether the endnotes are based on public domain material," and that all the endnotes are in fact based on public domain material, as Plaintiff

Wright has consistently maintained.  Joint Report in Response to
the Court's Order of February 2, 2009 at 2.

Second, they agree that Plaintiffs will not release the actual
names of law enforcement officials who are not public figures.  See
Pls.' Second Status Report at 8 n.2 (Mar. 12, 2009).  For these
officials, Plaintiffs agree to replace their names with pseudonyms
or to obtain written permission from these officials, prior to
publication, to use their actual names.  Id.  Defendants agree that
Plaintiffs may publish the actual names of law enforcement
officials who are public figures.  Defs.' Second Status Report at
6 (Mar. 13, 2009).  Therefore, these two issues have been resolved
and are no longer before the Court.

**C.  The Government Has Satisfied Its Burden to Justify
Censorship for Only One of Its Fourteen Objections to the
Fatal Betrayals Manuscript**

After almost seven years of litigation and a number of
reversals of position, the Government has substantially reduced its
list of objections to the Fatal Betrayals manuscript.  Only
fourteen remain.[16]   The Government attempts to justify its

---

[16]   Because the parties did not file their Second Status
Reports on the same day, as the Court required in its Order of
February 23, 2009 [Dkt. No. 128] ("[T]he parties shall file a
Second Joint Status Report") (emphasis added), Plaintiffs' Second
Status Report does not acknowledge all of the Government's
concessions.  See Defs.' Second Status Report at 2, n.1 (Much of
Plaintiff's status report . . . is erroneous because he had not
seen the Hardy Declaration.").  As a result, the list of issues
that remain in dispute is taken from Defendants' Second Status
Report and the Hardy Declaration.  Cf. Pls.' Second Status Report
(continued...)

censorship requests by relying, in large part, on two FOIA
Exemptions: Exemption 7, protecting law enforcement techniques and
procedures; and Exemption 5, embodying the deliberative process
privilege.[17]

However, Plaintiffs have relied upon the First Amendment, not
FOIA, Pls. Renewed Mot. at 2, and the Government has cited to no
case holding that FOIA is coterminous with the First Amendment.[18]
Any First Amendment analysis must be based on the principles set
forth in Pickering, NTEU, and Weaver. Consequently, censorship is
prohibited under the First Amendment where it fails the
Pickering/NTEU balancing test, even if the material falls within a
FOIA Exemption. McGehee explicitly rejected the Government's view
when it stated that "[b]ecause the present case implicates first
amendment rights, however, we feel compelled to go beyond the FOIA
standard of review for cases reviewing CIA censorship pursuant to
secrecy agreements." 718 F.2d 1148.[19]  In other words, not only was
the court not bound or limited by the FOIA Exemptions, but the

---

[16](...continued)
at 6 (referring to twenty Government objections, rather than
fourteen).

[17]    These two FOIA Exemptions are the only interests
presented by the Government to justify the censorship it seeks.

[18]    For reasons that are hard to fathom, Plaintiffs have
failed to object to the Government's heavy reliance on FOIA.  Nor
have Plaintiffs emphasized the primacy of their First Amendment
analysis.

[19]    Neither party briefed this issue.

court required an even more searching examination in First Amendment cases.

Consequently, censorship is prohibited, even if the material falls within a FOIA Exemption, where the Government fails to show with reasonable specificity that its interest in censorship of Government employees, in order to promote the efficiency of public services, outweighs the interest of prospective speakers in free dissemination of those speakers' views. While FOIA provides a useful analytical tool for assessing the strength of the Government's interest under the Pickering/NTEU balancing test, it cannot negate or override the First Amendment inquiry.[20]

### 1. Sensitive Law Enforcement Techniques and Information

The Government objects to two paragraphs of the manuscript on the ground that they contain information related to sensitive law enforcement techniques and information. Defs.' Second Status Report at 2; Hardy Decl. at 4-5. In response, Plaintiffs argue that the Government's justification for censorship is "vague" and "inadequate." Pls.' Second Status Report at 6.

FOIA's Exemption 7, upon which the Government relies, states in relevant part that requested materials may be withheld if they are "records or information compiled for law enforcement purposes,

---

[20]     Because the Government relies heavily, and almost exclusively, on its FOIA arguments, they will be examined and included in the Pickering/NTEU balancing.

-24-

but only to the extent that production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7).

The Government bears the burden of showing that materials fall within Exemption 7, and it must provide a "clear demonstration of how it has met that burden." Summers v. Dep't of Justice, 140 F.3d 1077, 1083 (D.C. Cir. 1998). A threshold question is whether the information was "compiled for law enforcement purposes." Ctr. for Nat'l Sec. Studies, 331 F.3d at 926 (citing 5 U.S.C. § 552(b)(7)). Exemption 7 covers investigative law enforcement materials, as well as non-investigative materials such as law enforcement manuals. See Tax Analysts v. IRS, 294 F.3d 71, 79 (D.C. Cir. 2002) (holding that an agency need not show that the materials were compiled in the course of a "specific investigation").

The Government alleges that the information on page 93 of the manuscript would reveal sensitive law enforcement activities, methods, and capabilities. Page 93 discusses the freezing of a bank account. The Government justifies its objection by stating that the "information discloses the effectiveness of the technique used in bringing the [Vulgar Betrayal] investigation to a successful conclusion" and that disclosing the information would

-25-

permit "those involved in criminal violations" to "change their activities and modus operandi in order to avoid detection in the future." Hardy Decl. at 4. In response, Plaintiffs argue that the techniques revealed are "common knowledge." Pls.' Second Status Report at 7.   The Government responds that Plaintiffs' "mere speculation" about whether a technique is common knowledge is "not persuasive."   Defs.' Second Status Report at 8.

Plaintiffs correctly assert that these techniques are "common knowledge."[21]   It is well known that the Government froze bank accounts as part of its counter-terrorism strategy.   See, e.g., Joseph Kahn and Judith Miller, A Nation Challenged: The Assets; U.S. Freezes More Accounts; Saudi and Pakistani Assets Cited for Ties to Bin Laden, N.Y. TIMES, Oct. 13, 2001, at A1.   In addition, the paragraph preceding the one objected to on page 93 -- to which the Government did not object and for which the manuscript includes a citation to the public domain -- states openly that the Office of Foreign Asset Control in the Treasury Department "ordered the freeze of all of Mohammed and Azita Salah's known bank accounts." See Hardy Decl., Ex. C.   Finally, the paragraph to which the Government objects reveals nothing substantive about a law

---

[21]   The Government argues that "Plaintiff's [sic] mere speculation that a particular technique at a particular location is common knowledge, offered without evidentiary support, is not persuasive."   Defs.' Second Status Report at 8. However, as discussed, supra, III.A, it is the Government, not Plaintiffs, that bears the burden of justifying censorship with reasonable specificity.

-26-

enforcement practice, nor does it describe the effectiveness of freezing bank accounts. Instead, it only describes the reaction of a person affected by the successful use of that particular law enforcement practice.

Because this information is "common knowledge" and does not reveal the substance of a sensitive law enforcement technique, the Government has not demonstrated that it has an interest in censorship that outweighs the public interest in disclosure. Accordingly, the Government has not satisfied the Pickering/NTEU balancing test with respect to the information on page 93.

The Government also alleges that the information contained on page 316 of the Fatal Betrayals manuscript references sensitive law enforcement infrastructure. It argues that its objections are warranted because █████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ Plaintiffs offer no response to this specific objection. See generally Pls.' Second Status Report.

This portion of the manuscript refers to a "secured chamber" and provides the specific location of that chamber. The Government's interest in protecting the confidentiality of this secure location is clearly substantial. On the other side of the Pickering/NTEU balance, Plaintiffs have not identified any interest either they or the public have in disclosing the existence of this

-27-

chamber or its precise location.    The balancing test therefore
tilts in favor of the Government with regard to the material on
page 316.

In sum, the Government has satisfied the <u>Pickering/NTEU</u>
balancing test with respect to the material on page 316 of the
manuscript, but has failed to meet its burden under <u>Pickering/NTEU</u>
for the material on page 93 of the manuscript.

## 2.    Deliberative Process Privilege

The Government objects to twelve other sections of the <u>Fatal
Betrayals</u> manuscript on the ground that they would "reveal the
government's deliberative process."[22]   Defs.' Second Status Report
at 2; Hardy Decl. at 5 ("The information reveals the formulation of
opinions, advice, evaluations, deliberations, policy formulation,
proposals, conclusions or recommendations associated with the
formulation and implementation of investigative and prosecutorial
strategies.").    The Government argues that revealing this
information would "chill the open and frank discussions . . . which
are necessary for the effective investigation and prosecution of
criminal and national security matters."   Hardy Decl. at 5.   In
response, Plaintiffs argue that this justification is vague and

_____

[22]    Presumably, the Government is relying on Exemption 5 of
FOIA which permits an agency to withhold "inter-agency or
intra-agency memorandums or letters which would not be available by
law to a party other than an agency in litigation with the agency."
5 U.S.C. § 552(b)(5).

that "[n]o sensitive information of any kind is revealed."  Pls.'
Second Status Report at 7.

It is not at all clear that the deliberative process privilege
applies in the First Amendment context, and the Government has
cited no cases in which it is so applied.[23]  However, even if it is
applicable in the First Amendment context, to succeed in this case
the Government must demonstrate both that its claim falls within
the narrow bounds of the privilege and that it satisfies the
Pickering/NTEU balancing test.

Three principal limitations narrow the scope of the
deliberative process privilege.  First, the privilege covers only
"documents reflecting advisory opinions, recommendations and
deliberations comprising part of a process by which governmental
decisions and policies are formulated."  Dep't of Interior v.
Klamath Water Users Protective Ass'n, 532 U.S. 1060, 1065-66 (2001)
(quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)
(internal quotation marks omitted)).  See also Stewart v. Dep't of
Interior, 554 F.3d 1236, 1239 (10th Cir. 2009).  It applies only to
"inter-agency or intra-agency memorandums or letters."  5 U.S.C. §
552(b)(5).

Second, to be covered by the deliberative process privilege,
the material in question must be predecisional.  In re Sealed Case,

_____

[23]    All of the cases cited by the Government analyze the
deliberative process privilege in the FOIA context.  See, e.g.,
Russell v. Dep't of the Air Force, 682 F.2d 1045 (D.C. Cir 1982).

121 F.3d 729, 737 (D.C. Cir. 1997). Material is predecisional if "it was generated before the adoption of an agency policy." Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)). To be predecisional, a "court must first be able to pinpoint an agency decision or policy to which these documents contributed." Morley v. CIA, 508 F.3d 1108, 1127 (D.C. Cir. 2007).

Third, the material must be deliberative in nature. In re Sealed Case, 121 F.3d at 737. As a result, "[w]hen the information at issue is "[f]actual material that does not reveal the deliberative process," it is not protected. Morley, 508 F.3d at 1127 (quoting Paisley v. CIA, 712 F.2d 686, 698 (D.C. Cir. 1983)). Material is deliberative if "it reflects the give-and-take of the consultative process." Morley, 508 F.3d at 1127. One key factor to be considered is whether disclosing the requested information would "inhibit candor in the decision-making process." Army Times Pub. Co. v. Dep't of the Air Force, 998 F.2d 1067, 1071 (D.C. Cir. 1993) (citing Petroleum Info. Corp. v. Dep't of the Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).

The Court will now examine each of the Defendants' 12 objections to material in the Fatal Betrayals manuscript, and follow the same order that was presented in the Hardy Declaration.

As to the material on page 138 of the manuscript, it concerns a decision as to whether the FBI would be able to undertake an investigation as large and time-consuming as Plaintiff Wright advocated. Not only is it pre-decisional, it is also deliberative in that it contains the thought processes of two other agents.

As to the material on page 181 of the manuscript, it recounts a conversation between Plaintiff Wright and an attorney for another Government agency. The material identifies no decision that resulted from the discussion described, nor was the conversation deliberative.

As to the material in pages 213-214 of the manuscript, it describes a presentation by Plaintiffs at a conference of federal agents and attorneys about the scope of the investigation. It was pre-decisional in terms of weighing and evaluating whether to proceed with the seizure. Individuals expressed their opinions in what was a deliberative discussion.

As to the material on page 214, it concerns a question asked by Plaintiff Wright of an Assistant United States Attorney as to whether she thought the seizure was "possible" and her response. Even though the conversation may be referring to the ultimate decision as to whether to go forward with the seizure of assets, it is clear that this was not a deliberative discussion about the advantages or disadvantages of the project.

As to the material on page 215 of the manuscript, it describes the views of an Assistant United States Attorney regarding the requirements for conducting additional investigation. While it related to what further investigation needed to be done before a decision could be made about proceeding with the seizure of assets, it was not deliberative in that there was no give-and-take of the consultative process.[24]

As to the material on page 219 of the manuscript, it refers to a discussion about replacing Plaintiff Wright with a non-intelligence affiant on an affidavit. This exchange concerned the decision as to how to most effectively present the Government's case in its application to a federal judge for approval of the seizure. It was pre-decisional and was deliberative in that people

---

[24]    The Government also objects to the release of the material on page 215 because it claims that it is protected by the attorney-client privilege. As the Government states, the attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice."   Hardy Dec. at 6.   The Government has failed to show that the statement made  by the Assistant U.S. Attorney described on page 215 was confidential.

For example, the Assistant U.S. Attorney made the statements at a "meeting"; therefore, the claims of confidentiality are dubious.   In addition, the Government has not identified the attorney, the client, or the "legal matter for which the client has sought professional advice."   Hardy Decl. at 6.   Finally, if Plaintiff Wright was the client, he may waive the privilege. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348-49 (1985) (discussing the power to waive the attorney-client privilege); In re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984) (stating that the privilege only applies if it is not waived by the client).

expressed their views and one Assistant United States Attorney vetoed the suggestion on the grounds that it would be wrong and misleading.

As to the material on page 220 of the manuscript, it states that an Assistant U.S. Attorney contacted Attorney General Reno's office and requested permission to immediately seize the remaining assets since $200,000 had recently been removed from the bank account. This information is clearly pre-decisional since the Assistant United States Attorney is requesting the Attorney General to make a decision authorizing the seizure. It is not deliberative because the particular language in question pertains only to the request rather than to any discussion or consultation about its merits.

As to the material on page 225 of the manuscript, it describes a conversation about the "fears" of "innocent Muslims" who were concerned about the bank account seizures. The decision which resulted from this particular conversation was a decision to submit a 37-page affidavit justifying the seizure. The conversation was deliberative in that it weighed the best approach to a troubling issue of how to allay the fears of a minority segment of the American population.

As to the material in pages 232-234 of the manuscript, it references questions prepared by FBI headquarters. It does not describe any decision that resulted from these questions or from

-33-

Plaintiff Wright's response to them. It was neither pre-decisional nor deliberative.

As to the material on page 238 of the manuscript, it describes a presentation made by Wright and his supervisor to a conference of FBI agents from around the country. It also conveyed the fact that a member of the National Security Law Unit, who was in the audience, agreed with and confirmed the accuracy of the material Wright and his supervisor had presented. The material described on page 238 is informational, not deliberative. It is unclear what, if any, decision was being made at this conference.

As to the material on page 260 of the manuscript, it describes a meeting in Chicago to discuss the opening of a duplicative criminal investigation in Milwaukee. Since it concerns the decision about whether to open such an investigation, it is, therefore, pre-decisional. It is deliberative in that it contains the differing views of a DOJ attorney and others.

As to the material on page 316 of the manuscript, it describes a statement by the Deputy Attorney General that "We will not have any of that here," in reference to complaints made during the meeting about another DOJ attorney. At that point, Plaintiff Wright decided it would not be useful to try to voice similar complaints. The Government has not identified any agency decision or policy that resulted from the making of the comment by the

Deputy Attorney General.   Moreover, the material is clearly not deliberative.

Thus, the Government has failed to show that the material referred to in seven of its 12 objections is both pre-decisional and deliberative as required by FOIA.[25]   For that reason, it has failed to carry its burden or proof to demonstrate that it has any interest in censorship based on the deliberative process privilege as embodied in FOIA. Since the Government has offered no other justifications for censoring this material, it has failed to satisfy the Pickering/NTEU balancing test with respect to these seven objections.

As to the Government's remaining five objections, which are covered by FOIA because they cover material that is both pre-decisional and deliberative,[26] the Government has presented no justification apart from the deliberative process privilege.   As already noted, the McGehee court felt "compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements," 718 F.2d at 1148.  However, the Government has failed "to go beyond the FOIA standard of review," and offers

_____

[25]   As described above, these are the objections contained in pages 181, 214, 215, 220, 232-234, and 316 of the Fatal Betrayals manuscript.

[26]   As described above, these are the objections contained in pages 138, 213-214, 219, 225, and 260 of the Fatal Betrayals manuscript.

no further justification for censoring this material from public view.

In reviewing these materials, the Court sees nothing that would justify suppressing information about "what their Government is up to," U.S. Department of Justice v. Reporters Committee for Freedom of Press, 489 U.S. 749, 773 (1989), when it makes decisions about prosecution of organizations it deems a threat to our national security. What subject could be of greater concern to the American public? Moreover, would not a long-time FBI agent who had participated in that decision-making have a perspective and insights that would be of interest to the American public?

Finally, it is up to the Government to present with reasonable specificity "reasonably convincing and detailed evidence of a serious risk that intelligence sources and methods would be compromised" by disclosure of the materials discussed, and that such risk outweighs the First Amendment interests of both Plaintiff and his potential audiences in dissemination of his views. McGehee, 718 F.2d at 1149. The Government has totally failed to articulate any such risk, and therefore has not met its burden under Pickering, NTEU, and Weaver.

**D.   The Government Has Not Satisfied Its Burden to Justify Censorship of the Miller Interview Answers**

The Government has conceded that all the answers to the following questions may be released for publication: 2-6, 8, 11-13, 15-16, 18-19, 21, and 25-26. Hardy Decl., Ex. B (Bolthouse

Decl.).  In addition, it has conceded that portions of answers to
three other questions may be released: the first sentence of the
answer to question 1, the first two sentences of the answer to
question 9, and the first sentence of the answer to question 14.
Id.

    Plaintiffs make two arguments in support of their claim that
the Government should withdraw its objections to publication of all
of the Miller interview answers.  First, they argue that the
Government has not justified its censorship of the Miller interview
answers with reasonable specificity.  Pls.' Renewed Mot. at 10.
Second, they contend that the Miller interview answers are in the
public domain and that the Government "has offered no evidence to
support its claim" that the material is not in the public domain.
Id. at 11.  In response, the Government argues that Plaintiffs have
failed to "show that any information that continues to be withheld
is in the public domain."  Defs.' Opp'n at 6.

    In their Second Status Report, Defendants made no new
arguments on this issue, and instead relied heavily on the
Bolthouse Declaration, which was filed December 16, 2004.  See
Defs.' Second Status Report at 9 ("[A]s to the New York Times
Judith Miller interview answers, the Declaration of Karlton
Bolthouse . . . explains the basis for the need to continue to
withhold the information.").

-37-

The Bolthouse Declaration does not provide individualized justifications for censoring the Miller interview answers. See Hardy Decl., Ex. B.   Instead, it provides the identical justification for censoring the Miller interview answers as it does for censoring the Fatal Betrayals manuscript and the two OIG complaints. See id. It argues that these materials "could not be published as each submission contained information regarding open investigations, information regarding matters occurring before a federal grand jury, information regarding sensitive law enforcement techniques, intelligence information and information otherwise prohibited from release." Id.

Defendants concede that "this information is no longer being withheld due to the existence of an open investigation," but argue that the "remaining grounds set forth in the Bolthouse Declaration at pp. 19-22, 24-26 still pertain to the redacted information." Defs.' Second Status Report at 9.   Defendants do not state the specific grounds to which they are referring, but the pages they list include the following three headings:  "Information related to matters before a federal grand jury," "sensitive law enforcement techniques/intelligence information," and "information prohibited from disclosure for other reasons."   Hardy Decl., Ex. B.

The Government is correct that Plaintiffs bear the burden of showing that material is in the public domain. See supra III.A. However, before the burden shifts to the Plaintiff to make this

-38-

showing, the Government must first justify censorship with reasonable specificity.  McGehee, 718 F.2d at 1148.  This the Government has failed to do. To the contrary, it relies on the four year old Bolthouse Declaration which merely gives generalized, conclusory, and inapplicable reasons for censoring material, much of which the Government is no longer even seeking to censor.  It made no effort to link a particular interview answer to a specific threat to a specific Government interest.  Instead, the Government again has left it to the Court to determine which of its broad allegations -- for example, that release of the Miller interview answers would reveal "sensitive law enforcement techniques" -- match up with particular interview answers.  In addition, it has not provided any evidence to indicate the likelihood that the release of a particular answer would actually result in the harm alleged or how the release of this information would produce that alleged effect.    For these reasons, the Government has fallen far short of its burden to justify censorship of the Miller interview answers with reasonable specificity.

## E.    The Government Has Not Satisfied Its Burden to Justify Censorship of the OIG Complaints

In spite of the Court's clear statement in its February 23, 2009 Order that the parties should state their positions "with specificity and appropriate case citations," the parties did not provide clear statements of their positions with respect to the OIG complaints.

The Government argues that the issue was previously resolved, as stated in the Bolthouse Declaration of December 16, 2004. See Defs.' Second Status Report at 2 (Mar. 13, 2009). The Bolthouse Declaration states that in March 2004, "a determination had been made that these documents could be submitted to the DoJ OIG and the FBI OPR without the need for prepublication review." Bolthouse Decl. at 18.

In contrast, Plaintiffs' pleadings deny that the issue has been resolved. In their Renewed Motion for Summary Judgment, Plaintiffs argue that the "declarations of both Plaintiffs clearly state" that the OIG complaints "are based on public domain information." Pls.' Renewed Mot. at 10.

As this Court's Opinion of July 31, 2006, stated, when the Government permitted release of the complaints to the DoJ and FBI, it did not automatically permit public release as well. See July 31, 2006 Opinion at 10 ("[R]elease to any other party was prohibited."). None of Defendants' subsequent submissions have indicated that they have changed their position and decided to permit release to parties other than the DoJ and FBI.

It is clear that the dispute has not been resolved. Plaintiffs have indicated that they do not believe release to the DoJ and FBI to be sufficient. However, the Government has offered no justification in this round of pleadings to support the continued censorship of the OIG complaints and merely stated that

-40-

the issue had been resolved previously in 2004.  The latter does not appear to be correct.  Thus, the Government has failed to provide a reasonably specific justification for censorship of the OIG complaints.

## IV.  Conclusion

For the reasons set forth above, Defendants' Renewed Motions for Summary Judgment [Dkt. No. 76] are **granted in part and denied in part** with respect to the Fatal Betrayals manuscript, **denied** with respect to the Miller interview questions, and **denied** with respect to the OIG complaints.  Plaintiffs' Motions for Summary Judgment [Dkt. No. 90] are **granted in part and denied in part** with respect to the Fatal Betrayals manuscript, **granted** with respect to the Miller interview questions, and **granted** with respect to the OIG complaints.

                                        /s/
May 6, 2009                      Gladys Kessler
                                 United States District Judge

**Copies to: Attorneys of record via ECF**